IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
JUDGE WALKER D. MILLER

Civil Action No. 03-cv-734-WDM-PAC

ADRIAN D. PEREA,

        Plaintiff,

v.

NATIONAL ASSOCIATION OF LETTER CARRIERS, *et al.*,

        Defendants.

_____

**ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
_____

Miller, J.

        This matter is before me on Defendants' Motion for Summary Judgment, filed

March 26, 2004.  I have considered the parties' written arguments[1] and their tendered

evidence and have determined that oral argument is not required.  For the reasons

stated below, the motion will be granted in part, and denied in part.

Background

        Plaintiff Andrea Perea (Perea) is a Mexican-American who was employed by the

U.S. Postal Service (USPS) from November 10, 1984 until October 21, 2002.  While

employed with the USPS, Perea was a member of defendant National Association of

Letter Carriers (NALC), a labor union which represents city letter carriers employed by

_____

        [1]On August 18, 2004, I granted Perea's motion to allow him to re-submit a brief in
opposition to the defendants' motion for summary judgment, based on a change in
counsel.  Consequently, I rely on Perea's September 1, 2004 response, and not his
May 28, 2004 response.

the USPS, and NALC's local branch, defendant Branch 5996.

The NALC and USPS are parties to a collective bargaining agreement (CBA) governing the terms and conditions of employment for city letter carriers.[2]  The CBA allows for union officials to represent members in investigating, presenting, and adjusting grievances against USPS through a grievance-arbitration procedure.

In the summer of 2000, Perea was the subject of threats from a co-worker named Paul Barnes (Barnes), culminating with a physical attack in October at Fletcher Station, the post office where they both worked.  During the attack, Barnes called Perea "a beaner, a spic, and a Mexican."  (Perea Dep., at 217.)  Barnes later alleged that USPS management had induced him to attack Perea because of Perea's involvement with the union.  Perea immediately reported the attack to his supervisor, and asked him to put a stop to it under the USPS' "Zero-Tolerance" policy.[3]  Perea then asked defendant Jeffrey Hartman (Hartman), president of Branch 5996, and defendant John Fechisin (Fechisin), vice president of Branch 5996, to file a grievance on his behalf under the Zero-Tolerance policy.  Despite his entreaties, Hartman and Fechisin did not even investigate the incident until December 2000, and never filed a grievance.  Additionally, Fechisin refused to provide Perea with a written statement regarding the incident for an EEO complaint; Hartman, however, did provide a statement.

---

[2]Defendants provide two versions of the agreement: (1) the version effective from 1998 through November 21, 2001 (Paster Decl., Ex. A-3); and the version effective from November 21, 2001 through 2006 (Paster Decl., Ex. A-4.)  The parties do not indicate that there are relevant differences between the two agreements.

[3]Perea in fact invoked both the USPS' Zero-Tolerance policy, and a Joint Statement on Violence and Behavior in the Workplace, signed by USPS and NALC.

According to Perea, Barnes' threats and attacks caused a dramatic deterioration of his mental state, which affected his attendance.  (Perea Aff., ¶ 10.)  On August 25, 2000, Perea received a first letter of warning, or a N-TOL (N-TOL #1),[4] for absences from work.  Perea grieved the letter, resulting in Fletcher Station Manager Jerry Quintana "thr[owing] the N-TOL #1 out."  (Perea Dep., at 41.)  However, Quintana's decision was never put in writing, and the N-TOL #1 remained in Perea's personnel file.

In January 2001, Quintana, after a meeting between himself, Perea, and Fechisin, placed Perea on a one-day emergency suspension, which was authorized under the CBA when "the employee may be injurious to self or others."  (Paster Decl., Ex. A-3 at 80.)  According to Defendants, Perea had been accused of sexual harassment by three other letter carriers, although Perea asserts that the issue of sexual harassment was never raised at the meeting.  Perea provides evidence that the charges were fabricated, including a statement from one of the alleged victims that Fechisin tried to convince her to file a false complaint against Perea.

Quintana advised Perea that Perea could not return until he obtained medical certification that he was fit to return to work, because Perea told him that he was "all stressed out."  (Perea Dep., ¶ 22.)  However, Quintana refused to provide Perea with a "medical certification packet," telling him that it would be mailed to him.  When four days had passed without Perea receiving the packet, he called Fechisin several times seeking his assistance in securing a packet.  Fechisin failed to obtain the packet,

---

[4]Under the CBA, letters of warning are referred to as "N-TOLs," which stands for "No Time Off Letter."  After an employee receives three N-TOLs, the next disciplinary step is termination.  (Shamah Dep., at 36.)

forcing Perea to eventually obtain the packet himself from USPS' labor relations representative.  Perea's difficulty in obtaining the packet resulted in him missing 18 days of work.

When he returned, Perea filed a grievance regarding this incident, but it was denied as untimely under the CBA's 14-day limitations period.  Perea also filed an EEO complaint.  The EEO investigator told Perea to obtain a statement from Fechisin that allegations of sexual harassment had not been mentioned at the meeting, but Fechisin refused to provide such a statement.

On April 2, 2001, Perea was transferred to a new post office, the Hoffman Heights Station.  On April 24, 2001, Perea received a second N-TOL (N-TOL #2) for missing work.  Defendant Timothy Murphy (Murphy), the shop steward for the Hoffman Heights station, grieved the N-TOL #2.  When it was not resolved at the first, informal step of the grievance process, Defendants sought and obtained a formal "Step A" meeting, the next step in the grievance process.  However, Perea asserts that, although the N-TOL # 2 would have been dismissed but for the prior N-TOL #1 in his file, Hartman and Murphy refused to utilize available evidence that Quintana had dismissed the N-TOL #1 and that the Postmaster had "forgiven" the unexcused absences underlying N-TOL #1.  Furthermore, Hartman did not confer with Perea prior to the Step A meeting, and at the meeting suggested that Perea resign, and refused to offer evidence regarding dismissal of the N-TOL #1 and that Perea's medical excuse. The meeting was terminated without resolution, but Hartman later met with the USPS official, without Perea's presence or permission, and reached a disposition reducing

4

the number of absences from 17 to 6 and reducing the time the N-TOL #2 would be retained in Perea's file from 2 years to 18 months.  Dissatisfied with the resolution, Perea filed a charge with the NLRB, which found no evidence that the union represented Perea in an "arbitrary or perfunctory manner."  (Defs.' Mem. Supp. Mot. Summ. J., Ex. A-17.)

On September 10, 2001, Perea overheard Hartman telling Murphy to let the USPS fire Perea.

On October 22, 2001, Perea received a third N-TOL (N-TOL #3) for missing work.  Although Perea repeatedly asked Murphy to file a grievance regarding the N-TOL #3, and provided him with a variety of potential defenses, Murphy never filed a grievance, and later claimed  that Perea failed to provide him with necessary medical documentation.

The same day Perea received his N-TOL #3, he asked the station manger for a referral to the USPS' Employee Referral Program ("EAP").  When the station manager refused, Perea asked Murphy to grieve the matter.  Despite his assurances he would do so, Murphy never grieved the refusal.

Beginning on December 10, 2001, Harman, Fechisin, and Murphy began heckling Perea whenever he would speak at union meetings.  They also heckled an African-American and a Mexican-American union member, but never heckled any white members.  This continued at union meetings until Perea stopped attending meetings after Fechisin tried to fight him at the October 2002 meeting.

On March 8, 2002, Defendants settled a class action grievance against USPS

regarding payment for workers who did not come to work during a snow-storm in the winter of 2001 (the "snow day grievance").  Under the settlement, some workers who did not come in to work received some pay for that day, while the only three employees who came in to work, including Perea and two other minority employees, were paid only for the time they actually worked.

At some point in the Spring of 2002, Perea brought internal charges against Hartman and the Branch which he read into the record at an April 2002 union meeting. Before the meeting, Perea told  NALC's national business agent, Gil Barela, that Perea felt he was being discriminated against on the basis of his national origin.  Barela told Perea he was aware of the charges, but left the meeting before Perea read the charges.

In May 2002, Bob Maloney, one of Perea's co-workers, told Perea that if he was not going to come to work, he should quit, and that "all you f------- Mexicans are lazy." (Defs.' Mem. Supp. Mot. Summ. J., Ex. A-2, at 23.)  Perea did not report the incident to management, but asked Murphy to file a grievance against management for allowing such hostile behavior to occur.  (Perea Dep., at 283.)  Similarly, in June 2002, another co-worker, Mike Gleason, arrived at work drunk and told Perea "I'm going to kick your ass you f------ Mexican."  (Defs.' Mem. Supp. Mot. Summ. J., at 23.)[5]  Murphy refused to file grievances on both incidents because he hadn't heard the statements, although

---

[5]There is some confusion in the record as to the date of these incidents.  In his response to Defendants' written interrogatories, Perea indicates that they occurred in May and June 2002; in his affidavit filed with his response brief, he indicates that he asked for the grievances to be filed in September 2001.  (Perea Aff., ¶ 64.)

Perea alleges that he provided Murphy with the names of witnesses to the events.

In September 2002, Perea applied to USPS for retirement on a medical disability.  On September 25, 2002, Perea entered into a Settlement Agreement with USPS, under which he agreed to release all claims he had against USPS, including by withdrawing all grievances under the CBA.  On January 27, 2003, Perea retired on a medical disability, retroactive to October 21, 2002, based on  diagnoses of post traumatic stress disorder, biochemical imbalance, and bi-polar mood disorder.

During the time Perea was employed with USPS, he observed various incidents that he believes demonstrate a bias by the Defendants against non-white individuals. In 1999, he had to convince Murphy to adequately represent an Asian-American in disciplinary proceedings.  He alleges that union steward Dave Fowler, who is not a defendant, once "engaged in the disparate treatment of an African American letter carrier in comparison to his treatment of white letter carriers."  (Pl.'s Br. Opp.  at 18.)  In February 2000, when an African-American member and a white member were involved in a confrontation, Murphy chose to represent the white member, and Hartman attempted to persuade Robert Goodson, another steward, to falsely indicate that the African-American member had started the fight.  In the summer of 2000, Hartman failed to adequately represent an African-American employee–including by failing to show up at a grievance meeting–resulting in the member's termination.

Perea's complaint asserts the following claims: (1) the Defendants denied his rights to equal employment opportunity and effective representation as a dues-paying union member because of his national origin in violation of 42 U.S.C. § 1981; and (2)

Defendants breached their duty of fair representation owed to Perea as a member of defendants NALC and Branch 5996.  In response to Defendants' argument that his duty of fair representation claim is time-barred under *DelCostello v. International Brotherhood of Teamsters*, 462 U.S. 151 (1983) and *Arnold v. Air Midwest, Inc.*, 100 F.3d 857 (10th Cir. 1996), Perea has conceded that his second claim should be dismissed.

## Standard of Review

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  The nonmoving party must set forth facts showing that there is a genuine issue for trial.  The court views the record in the light most favorable to the party opposing the summary judgment motion.  *Cummings v. Norton* , 393 F.3d 1186, 1189 (10th Cir. 2005).  A factual issue is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986).

## Discussion

Perea's complaint alleges that although Harman, Fechisin and Murphy were aware that he was subjected to unjustified disciplinary action by USPS based on his national origin, Defendants refused to adequately represent him and challenge the discriminatory conduct by USPS management, and in some instances themselves actively discriminated against Perea on the basis of his national origin.  (Compl., ¶¶ 15, 18-19.)  In his response brief, Perea asserts five general categories of "intentional and

discriminatory refusals or failures to act on [his] behalf:" (1) the failure to adequately represent him against disciplinary action taken by USPS, including by filing grievances; (2) the failure to file grievances with regards to conduct by co-workers under the Zero-Tolerance policy; (3) the failure to provide statements to Perea for his use in EEO complaints; and (4) Fechisin's failure to help Perea obtain a medical certification packet; and (5) Murphy's failure to file a grievance for the USPS' refusal to refer Perea to the EAP.  (Pl.'s Br. Opp. Mot. Summ. J., at 28-31.)  Defendants move for summary judgment, arguing that Perea has not presented evidence sufficient to create a triable issue of fact as to the existence of national origin discrimination.

42 U.S.C. § 1981 "prohibits racial discrimination[6] in the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Reynolds v. Sch. Dist. No. 1*, 69 F.3d 1523, 1532 (10th Cir. 1995).  "[C]ertain private entities such as labor unions, which bear explicit responsibilities to process grievances, press claims, and represent member in disputes over the terms of binding obligations that run from the employer to the employee, are subject to liability under § 1981 for racial discrimination in the enforcement of labor contracts." *Patterson v. McLean Credit Union*, 491 U.S. 164, 177 (1989).

A.    Prima Facie Case

---

[6]  Because the "racial" discrimination prohibited by § 1981 is not "limited to the technical or restrictive meaning of 'race,'" a claim that an employee was discriminated against because he was Mexican-American may state a claim under § 1981. *Manzanares v. Safeway Stores, Inc.*, 593 F.2d 968, 971 (10th Cir. 1979).

To make out a claim under § 1981, Perea must show that Defendants intentionally or purposefully discriminated against him.  *Reynolds*, 69 F.3d at 1532.  However, that does not mean Perea must show direct evidence of discrimination; rather, he may rely on the familiar *McDonnell Douglas* burden shifting framework to demonstrate intentional discrimination.  *Hysten v. Burlington N. & Santa Fe Rwy Co.*, 296 F.3d 1177, 1180 (10th Cir. 2002) (*citing McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).  Under that framework, Perea must first establish a prima facie case of prohibited discrimination.  Id.

The Tenth Circuit has not specifically prescribed a prima facie case for a § 1981 claim against labor union defendants.  However, I am guided by *York v. American Telephone & Telegraph Co.*, 95 F.3d 948, 956 (10th Cir. 1995), where a plaintiff asserted a similar claim under Title VII, namely that her union had refused to pursue her grievances on the basis of gender.  The court held that to establish a prima facie case against the union, the plaintiff had to show that (1) the employer violated the collective bargaining agreement with respect to the plaintiff; (2) the union permitted the violation to go unrepaired, thereby breaching the union's duty of fair representation; and (3) there was some indication that the union's actions were motivated by discriminatory animus.  *Id.* at 955-56.[7]  That version of the prima facie case should

---

[7]Some courts have found the first prong of this test unnecessary, and have instead utilized the following prima facie case: a plaintiff must demonstrate "(1) that the Union Defendants breached their duty of fair representation by allowing an alleged breach to go unrepaired; and (2) that the Unions [sic] Defendants' actions were motivated by gender [or discriminatory] animus."  *Nweke v. The Prudential Ins. Co. of Am.*, 25 F. Supp. 2d 203, 221 (S.D.N.Y. 1998) (*quoting Morris v. Amalgamated Lithographers of Am., Local One,* 994 F. Supp. 161, 170 (S.D.N.Y.1998)).

apply here.

Alternatively the *York* court held that a union may be liable if a plaintiff shows that it acquiesced in a company's prohibited employment discrimination. *Id.* at 956. In order to show illegal acquiescence, the plaintiff must show "(1) knowledge that prohibited discrimination may have occurred and (2) a decision not to assert the discrimination claim." *Id.*

The Defendants first argue that Perea must demonstrate that they interfered with a protected activity, namely the enforcement of the CBA. *See Shawl v. Dillard's Inc.*, 17 Fed. Appx. 908, 911 2001 WL 967887, at *2 (10th Cir. Aug. 27, 2001) (unpublished table decision) (to establish claim under § 1981, plaintiff must show, inter alia, that "the discrimination interfered with a protected activity as defined in § 1981"). Given the Settlement Agreement with the USPS explicitly waiving his rights under the CBA and withdrawing all pending grievances, Defendants assert that Perea cannot demonstrate that they interfered with the enforcement of the CBA.

This argument is without merit. Defendants make no showing that they were a party or a beneficiary to the settlement agreement. The fact that Perea settled with the USPS does not mean that he cannot demonstrate that the USPS breached the CBA, that Defendants failed to adequately represent him with regards to those breaches, and that they did so because of his national origin. *See York*, 95 F.3d at 955.

Next, Defendants argue that Perea has failed to demonstrate, with regards to their alleged failures to file grievances on his behalf, that any similarly situated letter carrier was treated differently. However, the applicable prima facie case does not

11

mandate such a comparison; rather, Perea need only demonstrate that there was some indication that the Defendants' actions were motivated by discriminatory animus. *Id.* at 955-56.  *See also Hysten*, 296 F.3d at 1181 (*quoting Furnco Constr. Corp v. Waters*, 428 U.S. 567, 576 (1978)) (under *McDonnell Douglas*, "[t]he real question...is whether a plaintiff has shown 'actions taken by the [defendant] from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were based on a discriminatory criterion'").

Perea provides evidence of instances where the Defendants did not provide adequate representation to non-white union members.  *See McAlester v. United Air Lines, Inc.*, 851 F.2d 1249, 1260 (10th Cir. 1988) ("[d]iscriminatory treatment may be shown by gross statistical disparities and specific instances of individual discrimination").  For instance, he provides evidence of Hartman and Murphy each being less-than-diligent when representing a minority union member, and complains that when he and two other minority union members who showed up at work on a snow-day in 2001, they were paid only for the time they worked, while Hartman obtained additional pay for employees who did not show up to work at all.  However, these incidents do not give rise to an inference of discriminatory intent, because there is no evidence that Defendants did a better job representing white members, or that, regarding the snow-day grievance, the only members who received additional pay were white.

Perea also provides evidence that Hartman, Fechisin, and Murphy "heckled" only minorities at union meetings.  Additionally, he provides evidence that, when

12

dealing with a fight between a white union member and an African-American union member, Hartman and Murphy gave favorable treatment to the white member.

The Tenth Circuit has emphasized that "[t]he burden of establishing a prima facie case in the *McDonnell Douglas* framework is not onerous." *Annett v. University of Kansas*, 371 F.3d 1233, 1241 (10th Cir. 2004) (quotation omitted). Furthermore, I am required to view the factual record and draw all reasonable inferences therefrom most favorably to Perea. *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). Consequently, I find that Perea has furnished evidence providing "some indication that the union's actions were motivated by discriminatory animus." *York*, 95 F.3d at 956.

Defendants next argue that Perea has not established a prima facie case with regards to their failure to file grievances regarding the attacks and harassment by co-workers, because these incidents cannot constitute adverse employment actions, and because they involved no violations of the CBA. I disagree. First, as noted above, Perea need not establish that an adverse employment action occurred as part of his prima facie case. *See York*, 95 F.3d at 956. Second, Defendants admit that they had the ability to enforce the Zero-Tolerance policy, making it a factual issue whether the policy was, informally at least, incorporated in the CBA. (Def. Br. Supp. Mot. Summ. J., at 8, n.1.) Furthermore, with regards to the attack by Paul Barnes, Perea asserts that USPS management encouraged Barnes to attack Perea, and Defendants do not

establish that such encouragement would not violate the CBA.[8]

Consequently, because Defendants' arguments fail,[9] I will assume that Perea

has met his prima facie case with regards to Defendants' failures to (1) adequately

represent him against disciplinary action taken by USPS; (2) file grievances with

regards to conduct by co-workers under the Zero Tolerance Policy; (3) provide

statements to Perea for his use in EEO complaints; and (4) help Perea obtain a

medical certification packet; and (5) file a grievance for the USPS' refusal to refer

Perea to the Employee Assistance program.

---

[8]Defendants also argue that Perea has not established a prima facie case for Perea's claim that he was "constructively discharged," because any alleged harassment that caused him to retire was a result of his union activity, and not his national origin. It is not clear that Perea is asserting claim of constructive discharge–he does not list it as one of the Defendants "intentional and discriminatory refusals or failures to act on [his] behalf:" (Pl.'s Br. Opp. Mot. Summ. J., at 28-30.)  Regardless, I agree with Defendants that he may not prevail on such a claim.

Because the Defendants could not, of course, grieve the fact that Perea quit, they may only be held liable for his constructive discharge to the extent that they acquiesced in the USPS's prohibited employment discrimination; i.e., the creation of a "race-based, intolerable working conditions."  *See York*, 95 F.3d at 956; *Bolden v. PRC, Inc.*, 43 F.3d 545, 552 (10th Cir. 1994).  I agree with Defendants that Perea has not established facts that would allow him to assert a constructive discharge claim against USPS on the basis of national origin; at best, Perea provides evidence of only three incidents of workplace harassment that had any racial overtones, occurring over the course of two years.  Under these circumstances, a reasonable fact-finder could not find that he was "forced to quit due to race-based, intolerable working conditions." *Reynolds*, 69 F.3d at 1534.  Accordingly, to the extent Perea asserts a claim of constructive discharge under § 1981, that claim must be dismissed.

[9]Perea has not necessarily provided evidence that would demonstrate that he has met each requirement of the prima facie case set forth in *York*.  However, because under Rule 56 the Defendants bear the burden of demonstrating that they are entitled to judgment as a matter of law, I may not grant Defendants motion on the basis of an argument that they did not make, and to which Perea did not have the opportunity to respond.

B.    Defendants Facially Non-Discriminatory Reasons

Under the next step of the *McDonnell Douglas* framework, Defendants bear the

burden of articulating facially nondisciminatory reasons for their challenged actions.

*Reynolds*, 69 F.3d at 1533.  If they do so, Perea then bears the burden of

demonstrating that such reasons are pretextual.  *Id.*

1.    October 2000 Attack by Paul Barnes

The Defendants assert that they elected not to file a grievance regarding the

attack on him by Barnes because (a) the only witnesses to the event were Perea and

Barnes, making it a "matter of credibility;" and (b) because Barnes was disciplined,

there was nothing Defendants could do.  However, the credibility issue had to do with

Barnes' allegation that management encouraged him to attack Perea; there was no

credibility issue that could have prevented the Defendants from grieving USPS for

failing to enforce its Zero-Tolerance policy.  Furthermore, Perea disputes that Barnes

was disciplined for this incident.  (Perea Dep. ¶ 16.)  Finally, Perea provides evidence

that, despite the fact that he immediately asked Hartman and Fechisin to investigate

the incident, they did not do so for thirty-eight days.  Under these circumstances, Perea

has established that there is a genuine issue as to whether the Defendants' articulated

reasons are pretextual.  *See Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)

("Pretext can be shown by such weaknesses, implausibilities, inconsistencies,

incoherencies, or contradictions in the employer's proffered legitimate reasons for its

action that a reasonable factfinder could rationally find them unworthy of credence and

hence infer that the employer did not act for the asserted non-discriminatory reasons").

15

2.      January 22, 2001 Emergency Placement

Defendants argue that they refused to grieve the USPS' suspension of Perea

based on allegations of sexual harassment because the USPS was entitled under the

CBA to implement such a suspension.  However, Perea provides evidence that

Fechisin helped the USPS fabricate the allegations, by attempting to persuade another

carrier to falsely accuse Perea of sexual harassment.  A reasonable factfinder could

find that such evidence established pretext.

3.      N-TOL #2

Defendants argue that through their efforts, the discipline provided under N-TOL

#2 was in fact reduced, and the fact that Perea was dissatisfied does not demonstrate

that they violated their duty of fair representation.  Perea responds with evidence that

the N-TOL might have been entirely dismissed had Hartman properly investigated the

issue and presented evidence that Perea identified.  Further, Perea avers that

Hartman's conduct at the meeting was inappropriate, and that the eventual settlement

was reached without Perea's knowledge or consent.  A reasonable factfinder could find

that such evidence established pretext.

4.      N-TOL# 3

Defendants argue that Murphy did not file a grievance to N-TOL #3 because

Perea told him he did not want to file a grievance and did not provide medical

documentation to support a challenge to the letter.  Perea disputes this contention, and

asserts that he asked Murphy eight times to file the grievance, brought potential

defenses to Murphy's attention, but that Murphy did not file the grievance until it was

16

too late.  A reasonable factfinder could find that such evidence established pretext.

### 5.     Co-worker harassment

Defendants argue that the harassment by his co-workers could not have been grieved because he provided no corroborating evidence, and because there was no basis under the CBA for such a grievance.  Perea responds that he provided Murphy with the names of witnesses, but that Murphy never contacted the witnesses. Furthermore, despite Defendants' argument that there was no basis to file a grievance under the CBA, they elsewhere admit that they had the ability to enforce the Zero-Tolerance policy under some circumstances.  (Def. Br. Supp. Mot. Summ. J., at 8, n.1.) A reasonable fact finder could find that such evidence established pretext.

### 6.     Snow Day Grievance

Defendants argue that Perea was not included in the "class action" grievance regarding a snow day because Murphy based the grievance on the fact that workers should not be penalized for not showing up to work when it was impossible for them to do so, and therefore only filed on behalf of workers who demonstrated that they were unable to make it to work.  Because Perea came to work on the day at issue, he was not included.  Perea argues that the only three employees who did come to work were minorities, and therefore Murphy's refusal to include them in the grievance was based on discriminatory motives.  This argument, as noted above, fails, because Perea provides no evidence that the only employees who received additional pay from the grievance were white employees.  Consequently, the snow-day grievance cannot support Perea's § 1981 claim.

7.  Denial of Referral to EAP Program

Defendants argue that they did not grieve USPS' failure to refer Perea to EAP

because there was no basis under the CBA for such a grievance.  Perea argues that

the CBA does provide for such grievances.

The applicable section of the CBA generally provides that USPS shall provide

an EAP program including the "education, identification, referral, guidance and follow-

up" of employees suffering from alcoholism and drug-abuse.  (Paster Decl., Exs. A-3 at

111 & A-4 at 112).  It also requires labor and management to "support the continuation

of the EAP for alcohol, drug abuse, and other family and/or personal problems at the

current level." *Id.*  It is not clear what precisely the CBA provides for; however, the

Defendants' interpretation of these provisions to conclude that there was not basis for

them to grieve USPS for refusing to refer Perea for a problem unrelated to alcohol or

drug-abuse is reasonable.

However, Perea also asserts that Murphy never told Perea he would not grieve

USPS' refusal to refer him for this or any other reason; he simply kept assuring Perea

he would file the grievance and then never did.  (Perea Aff., ¶ 66.)  Under such

circumstances, a reasonable factfinder could find the Defendants' reason pretextual.

8. Remaining Conduct

The Defendants do not articulate any non-discriminatory reasons for (1) their

refusals to provide statements in support of Perea's EEO complaints; and (2)

Fechisin's failure to help Perea obtain a medical certification packet.  Arguably, these

incidents do not involve breaches of the CBA.  However, Defendants did not make that

18

argument, and I will not address it.

In conclusion, I find that, with the exception of their arguments regarding constructive discharge and the snow-day grievance, Defendants have failed to demonstrate that there is no genuine issue of material fact, and that they are entitled to judgment as a matter of law on Perea's § 1981 claim.

D.  Liability of NALC

Defendants argue that, even assuming the individual defendants and Branch 5996 have violated Perea's rights, he has established no facts allowing for NALC to be liable.  I agree.

The parties agree that common law agency theories of vicarious liability govern NALC's liability for the other Defendants' conduct.  *See Alexander v. Local 496, Laborers' Int'l Union of N. Am.*, 177 F.3d 394, 409 (6th Cir. 1999).  Consequently, NALC may be liable only if Perea adduces "specific evidence that [NALC] instigated, supported, ratified, or encouraged those actions."  The only evidence Perea provides is that he mentioned his allegations of national origin discrimination by the other defendants to an official of NALC before a union meeting.  However, generally "[a]n international union has no independent duty to intervene in the affairs of its local chapters, even where the international has knowledge of the local's unlawful acts." *Phelan v. Local 305 of the United Ass'n of Journeymen*, 973 F.2d 1050, 1061 (2d. Cir. 1992( (*citing Carbon Fuel Co. v. United Mine Workers of Am.*, 444 U.S. 212, 217-18 (1979)).

Perea notes that some courts have held that, where an agency relationship

exists, a national union has an affirmative duty to oppose a local's discriminatory conduct. *Sinyard v. Foote & Davies Div. of McCall Corp.*, 577 F.2d 943, 945 (5th Cir. 1978). However, the *Sinyard* court cautioned such an affirmative duty is not absolute, and found that in the case before it, such a duty was warranted by "the relationship between the international and the local and the amount and type of involvement which the international has" with the discriminatory practice under challenge. *Id. See also Laughon v. Int'l Alliance of Theatrical Stage Employees*, 248 F.3d 931, 935 (9th Cir. 2001) ("[i]f local exercises considerable autonomy in conducting its affairs, it cannot be regarded as an agent of the international, and the international accordingly cannot be held liable under an agency theory for the local's actions"); *Flanagan v. Aaron E. Henry Cmty Health Servs.*, 876 F.2d 1231, 1236 (5th Cir. 1989) (because § 1981 requires intentional discrimination, nature of principal-agent relationship must be inquired into before principle may be liable for agent's discrimination).

Although Perea asserts that "clearly" a principal-agent relationship exists between NALC and Local 5996, in fact, there is no evidence in the record before me regarding the two entities' relationship. As a consequence, a reasonable factfinder could not determine that the relationship between the two was sufficient to give rise to an affirmative duty on the part of NALC to intervene in Local 5996's affairs, and Perea's claim must be dismissed as to NALC.

E.    Frontpay and Punitive Damages

The Defendants assert that they cannot be liable for frontpay damages as Perea has testified that he is no longer capable of gainful employment. Perea argues that he

20

now may be capable of working, and that the issue should be preserved should a jury determine that Defendants caused his separation from USPS by their discrimination. However, as I found above, Perea's § 1981 claim, to the extent it relies on an allegation of constructive discharge claim, must be dismissed, and that allegation appears to provide the only basis for frontpay damages.  Consequently, I agree with Defendants that Perea is not entitled to frontpay.

Defendants argue that Perea is not entitled punitive damages for his duty of fair representation claim, which he has abandoned; however, they do not appear to argue that such damages are prohibited under § 1981.  *See  Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 851 (2001).  Consequently, Defendants have not demonstrated that Perea is not entitled to punitive damages under § 1981.

Accordingly, it is ordered that :

1.      Defendants' motion for summary judgment, filed March 26, 2004 (Docket # 37), is granted in part and denied in part.

2.      Plaintiff's first claim for relief, alleging violations of 42 U.S.C. § 1981, is dismissed with prejudice against defendant NALC.

3.      To the extent Plaintiff's first claim for relief seeks relief against the remaining defendants on the allegations that he was constructively discharged, and that they failed to adequately represent him with regards to the "snow day grievance," it is dismissed.  Otherwise, his first claim remains pending against defendants Branch 5996, Fechisin, Hartman, and Murphy.

4.      Plaintiff's second claim for relief, alleging that Defendants breached their

duty of fair representation to Plaintiff, is dismissed with prejudice as to all

defendants

5.      Defendants' Motion to Continue Trial Date, filed June (Docket # 93), is

denied as moot.

DATED at Denver, Colorado, on June 23, 2005.

BY THE COURT:


/s/ Walker D. Miller
United States District Judge